AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  **23mj1447** |
| Instagram account 2130_countup | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC sec. 1591 | Sex Trafficking by Force, Fraud, and Coercion |
| 18, USC sec. 2422 | Coercion and Enticement of a Minor to Engage in Prostitution |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Aron Marcellus, incorporated herein by reference.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aron Marcellus, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  _____04/25/2023_____

*William V. Gallo*
_____
*Judge's signature*

City and state:  San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Aron Marcellus, being duly sworn, hereby depose and state as follows:

1.     I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.  These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

2.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

3.     Since October 2019, I have been assigned to the SDHTTF where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

4.     My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received

training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

5.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.     Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.     Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

c.     Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

d.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "c" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

6.     This affidavit is in support of an application by the United States of America for a search warrant for Meta Platforms, Inc., as described in Attachment A, to search the following Instagram account:

2130_countup (**Target Account**)

from April 5, 2023 through April 10, 2023, for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code, Sections 1591 and 2422, as described in Attachment B.

7.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of victims; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

<u>STATEMENT OF PROBABLE CAUSE</u>

8.     On Sunday, April 9th, 2023, at approximately 1300 hours, San Diego Police Department Officers responded to a report of a robbery at 3792 4th Avenue, in the city and county of San Diego. This location is a 7-Eleven Store. The radio call stated a female was hit by a vehicle and her phone was stolen. Upon arrival, officers contacted the 16 year-old victim, JF. JF told the officers, in essence, that a male subject known to

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813

her as "Deondre" (later identified as Deondre Demetris PORTER ("PORTER")) and an adult female physically assaulted her, strangled her, prevented her from leaving, and ultimately stole one of JF's cellphones out of her hand. PORTER and the adult female left the scene. JF gave a physical description of PORTER and the adult female. JF also reported that PORTER is known to her as "Count Up" and the adult female goes by "Kash". JF told the officers that PORTER's Instagram account is "2130_Countup" and his phone number is ██████5961. JF stated the adult female's phone number is ████2461. JF showed officers a photo on her phone of her standing in front of PORTER's vehicle, a white BMW bearing CA/9DOC085. A records check of the license plate revealed the vehicle is registered to Deondre Demetris PORTER. Due to the extent of JF's injuries observed at the scene, to include, bruising and abrasions to her left knee, right eyebrow, right leg, and right shoulder, as well as redness around her eyes and neck. She was transported by ambulance to the emergency department at UCSD Hillcrest where she was admitted for emergency care.

9.      Two witnesses were interviewed. L██ F██ reported seeing a white BMW quickly leave the area and JF laying on the ground. She believed JF had been hit by the white BMW. JF told L.F. that she was 16 years old and a trafficking victim. M███ F██ reported seeing JF either jumping or being thrown out the rear driver's side seat of a white BMW, with her belongings. JF's top was pulled down exposing her breasts.

10.     Based on this information, officers contacted the San Diego Human Trafficking Task Force for further investigation.

11.     On April 9th, at about 1530 hours, SDPD/SDHTTF Task Force Officers (TFO) arrived at UCSD Hospital – Hillcrest and interviewed JF. The following is a synopsis of JF's statement and has been edited for clarity and brevity and is not a verbatim account.

**STATEMENT OF JF**

12.     JF began communicating with PORTER on Instagram (via her account "███████████  and PORTER's account "2130_countup") approximately three

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT                                    Email Search Protocol_SLF_041813

days ago and planned to meet. She believed the intent was to "drink and smoke" and did not initially believe him to be a trafficker. PORTER picked JF up from the hotel in which she was staying with another friend and drove her to an unknown hotel in Victorville. At this hotel, she met two adult females. One of the females left shortly after JF's arrival. The other female JF identified as "Kash" or "Aliyah." JF did not know this person's true identity and referred to her as Kash throughout the interview. JF also referred to Kash as PORTER's bottom.[1] JF stated Kash is a Black female, slim, tall, and wearing a wig. JF stated Kash has butterfly tattoos on her neck and hands. JF recalled Kash pinching her out of jealousy after getting to the hotel in Victorville.

13.    JF stated that once at the hotel in Victorville it became clear that PORTER is a trafficker as he began telling JF his rules[2] in person. JF recalled his rules included that she had to "work all day everyday" and had a $1500 quota each night/using ten condoms[3]. If she didn't make quota, JF stated "he would get to beating my ass but he wouldn't beat the other bitch up and she wouldn't make no money." She also explained that all of her earnings from commercial sex would be collected by PORTER and he would spend JF's money on Kash. JF estimated giving PORTER over $1,000. PORTER told JF that if she wanted to leave she would have to pay an exit fee[4] of $5,000 and give

---

[1] Based on my training and experience, I know the term bottom to refer to a prostituted person under the control of a trafficker who handles much of the enforcement and day to day dealings within the pimping and prostitution subculture. The bottom is often used to shield the trafficker from legal troubles. The trafficker also utilizes the bottom role to pit the prostitutes under their control against one another, vying for that position, as it often means a reduced amount of commercial sex acts they have to perform.

[2] Based on my training and experience, I know the term rules to commonly refer to a set of expectations a pimp or trafficker has for a prostitute under their control.

[3] Based on my training and experience, I know the term quota to refer to a trafficker's expectation of how much money a person under their control is required to make before they can stop engaging in commercial sex for that time period. This may be a dollar amount or an amount of condoms used.

[4] Based on my training and experience, I know the term exit fee to refer to an amount of money a prostituted person is required to pay to be able to leave their trafficker; this amount is usually an unobtainable amount.

him both of her phones. JF stated PORTER required her to be advertised for commercial sex on websites such as Private Delights and MegaPersonals.[5] JF described PORTER setting up a MegaPersonals account for her by having JF pose for a photo with the ID of Kash or another girl[6] and then posting photos of JF in the advertisements. JF believed the setup of the account and posting of advertisements occurred using Kash's trap phone.[7] JF stated that PORTER would communicate with the sex buyers responding to JF's ads and direct JF's commercial sex activity both in San Bernardino and San Diego using his phone. She stated she observed PORTER to be the only person to use his phone; she did not see anyone else other than PORTER using his phone. JF stated she told PORTER she was 16 years old, and he did not care. JF stated PORTER told Kash that JF was 16 years old. JF stated that PORTER asked to have sex with her, but she told him that due to being on her menstrual cycle she could not.

14.     JF stated she, PORTER, and Kash initially left Victorville to go to G Street in San Bernardino[8]. However, when PORTER learned JF had contacts in San Bernardino he decided it would be better to travel to San Diego instead to further isolate JF. Once in San Diego, JF stated they checked into a hotel room at a Motel 6 and stayed for one night. JF looked at a map and believed she was at the Motel 6 Downtown San Diego located at 1546 2nd Avenue in the city of San Diego. JF recognized a picture of the hotel, specifically the windows and parking lot. JF did not know who booked the room and could not remember in what room they stayed. JF stated that she was required

---

[5] Based on my training and experience, I know these websites primary usage is for the advertising of commercial sex.

[6] Based on my training and experience, I know MegaPersonals requires users to take a photo with an ID showing they are an adult as age verification in order to make an account to post commercial sex ads. For minors this is often defeated by using a similar enough looking person's ID, such as in this case, or other means such as buying an already active account or having an adult create the account themselves.

[7] Based on my training and experience, I know a trap phone in this context to refer to a phone used for the purpose of prostitution/illegal activity.

[8] Based on my training and experience, I know G Street in San Bernardino to be a blade/area in which street level prostitution is publicly available.

to do incall, outcall, and car date[9]  commercial sex encounters from online advertisements and walk the blade[10] on Roosevelt Avenue.[11] While walking the blade, PORTER would be in his vehicle circling the area. When engaged in commercial sex encounters at the hotel, PORTER and Kash would wait in the hotel room bathroom. She estimated completing three $500 commercial sex encounters each day while in San Diego. JF believed she had deleted any messages she had with PORTER, per PORTER's directions.

15.     Prior to the assault, JF stated PORTER and Kash were mad at her for being "kidnapped" twice. JF stated that earlier that day she was walking the blade on Roosevelt Avenue and PORTER told her she had ten minutes to get a "date"[12], otherwise she would get "beat." JF got into a vehicle after negotiating a $200 date. JF was not able to provide specific details but alleged this person was trying to kidnap her. She was able to get away and as a result, PORTER assaulted JF. On a second occasion, JF got into a vehicle with who she believed to be a sex buyer. The subject was armed with a handgun and disclosed he planned to rob PORTER. JF was able to escape the situation once again.

16.     Following these incidents, JF was in the white BMW with PORTER and Kash. PORTER and Kash began arguing with JF and JF attempted to escape the vehicle. JF stated Kash prevented JF from exiting the vehicle by closing the door when JF would open it to escape. JF stated Kash began striking her on the face and back of her head

---

[9] Based on my training and experience, I know an incall to be a prostitution encounter where the sex buyer travels to the prostituted persons location; an outcall to be where the prostituted person travels to the sex buyers locations; a car date to be a prostitution encounter that happens in a vehicle.

[10] Based on my training and experience, I know a blade, track, or stroll as a geographical area known for prostitution activity, where prostitutes gather to be solicited by those seeking to exchange sex for money.

[11] Based on my training and experience, Roosevelt Avenue is a known blade in San Diego County.

[12] Based on my training and experience, the term date commonly refers to a prostitution encounter.

with both open hand blows and closed fist punches. Kash then began strangling JF with both hands, feeling both of her thumbs over her airway; JF estimated the strangling to last approximately seven seconds. JF recalls "I passed out for a second." JF believed Kash had additional "animosity" towards her; but later expressed that Kash had been nice to her early in the day and then started hitting JF because her "boyfriend told her to." JF explained that, at this point, PORTER began striking the back of her head and her face with both open hand blows and closed fists. JF stated she believed the two were trying to kill her as she heard them both make statements to the effect of, "I'm going to kill you bitch" and "you're going to get killed today." JF stated she was able to exit the vehicle. JF also stated that she felt a push on her back, but also described trying to get out of the vehicle. Upon exiting, JF recalls landing on her head and being positioned on the ground towards the front of the vehicle. From this position she could see PORTER driving the vehicle and saw the vehicle drive forward with the front tire coming towards her head. Based on the actions and statements of PORTER and Kash, she believed PORTER was trying to run her over in an effort to kill her. JF was able to quickly get up off the ground and move out of the way of the vehicle; JF believed that had she not moved, she would have been hit by the vehicle driven by PORTER. JF reiterated this occurred in the 7-Eleven parking lot.

17. JF stated that during the assault PORTER and Kash were trying to forcibly take her cellphone and strip her of her clothing. JF stated PORTER or Kash was able to take one of her cellphones, but that she was able to hold onto her other cellphone. Prior to our arrival at the hospital, JF was able to locate her stolen phone using the Find my Phone app and saw her phone was in Riverside County. However, eventually she was no longer able to track the stolen phone's location.

18. During the interview, JF showed TFOs a photo of her standing in front of PORTER's vehicle as seen below. The vehicle in the photo, and as reported to the SDPD officers by JF, also matches the description of the vehicle given by witnesses at the scene.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813



19.     JF gave verbal and written consent to search the contents of her cellphone and create a forensic copy of the contents.

20.     After obtaining JF's statement, Officer Addison provided a California Driver's License photo matching the registered owner and address of the white BMW for Deondre Demetris PORTER CDL# ████████ and DOB of ████████ Upon being shown PORTER's driver's license photo, JF immediately recognized the person to be who she knows as Deondre and "Count Up."

### DIGITAL EVIDENCE

21.     A digital forensic extraction of JF's cell phone was conducted. Below are descriptions of some of the relevant content found in the extraction.

22.     Within the messages stored in the iMessages application, there was a conversation with the phone number ████████5961 previously reported by JF as PORTER's phone number. The conversation begins on Wednesday, April 5th, 2023, as seen below. In the screenshot below and left, messages can be seen where JF asks PORTER if she has any requests for commercial sex. PORTER replies with a screenshot of sex buyers he is communicating with for JF. In screenshot below right, the conversation continues with PORTER directing JF to video call the sex buyer, directing

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT                                                              Email Search Protocol_SLF_041813

1  her how to interact with the sex buyer, and telling her how much he negotiated for the
2  commercial sex act she is to perform.




    23.    In the below messages, PORTER continues to tell JF what he expects her
to charge for commercial sex acts and how to interact with sex buyers:

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT                                    Email Search Protocol_SLF_041813

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20  / /
21  / /
22  / /
23  / /
24  / /
25  / /
26          24.     In the below messages PORTER arranges a prostitution encounter for JF.
27  Afterward, she tells PORTER the sex buyer paid via Cash App. PORTER responds by
28

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT                                    Email Search Protocol_SLF_041813

sending JF his Cash Tag for her to use to transfer her earnings to him. She responds with a screenshot of her sending PORTER $224. In the screenshot of the Cash App transaction, PORTER's name can be seen as the owner of the account in which she is sending money.



/ /

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813

25.     In the messages to the below left, PORTER tells JF that she has multiple dates in quick succession that he has arranged for her. Afterward, he asks her how she is feeling. In the messages to the below right, JF tells PORTER she feels like "shi."




26.     Following, she explains that she has cramps as seen below [note: during the interview she explained that her menstrual cycle had begun during this time.] However, she is not allowed to get treatment until after completing additional commercial sex acts. He emphasizes his expectation for continual engagement in

commercial sex by telling her he wants her to engage in commercial sex for 30 days straight:



27.    The above is a short synopsis of JF and PORTER's text message conversation. There are several messages exchanged between and/or after the above screenshots.

28.    An Instagram direct message conversation between JF and PORTER was also located within the extraction contents. The first messages begin on Thursday April 6th, 2023 and continue through 3:12 PM on April 9th. Of significance, the two are

1   initially conversing where it is clear they know one another. On April 9th at 12:20PM,

2   about 40 minutes prior to the assault on JF, PORTER tells JF, "U puttin yoself in a bad

3   situation." At 3:12PM, JF tells PORTER, "IMMA MAKE SURE YO BITCH GET

4   BEAT TFC UP LIKE YALL BEAT ME UP." Based on the timing and context of the

5   assault, this exchange appears to be JF threatening retaliation for the assault by

6   PORTER and Kash. PORTER responds, "Wrong person" seemingly claiming

7   ignorance of the matter.

8       29.   The extraction of JF's cell phone also contained a Cash App account for

9   JF that had transactions with "Deondre Porter" using an account name consistent with

10   PORTER's known moniker. The transaction history between JF and PORTER was

11   consistent with their messages and JF's statement that her earnings were given to

12   PORTER.

13   / /

14   / /

15   / /

16   / /

17   / /

18   / /

19   / /

20   / /

21   / /

22   / /

23   / /

24   / /

25   / /

26   / /

27

28

30.     The extraction of JF's cell phone contained an exchange between JF and the phone number JF reported as belonging to Kash (████████2461). In these messages, Kash is directing JF to share her location.[13] JF is then communicating with Kash about presumably a sex buyer not wanting to pay her for the commercial sex acts up front, as is typical in this type of encounter. Lastly, Kash is once again wanting to know JF's whereabouts.



31.     On April 10th, TFO Dierdorff and Wiener followed up with JF. During this contact, additional photographs were taken of JF's injuries to her face, neck and knee. In the photographs, JF has visible bleeding in her eyes, extensive bruising under eyes, apparent abrasions to the side of her face, strangulation marks on her neck, and large scrapes on her knee.

32.     JF was asked to identify which messages in her phone were between her and PORTER; she pointed to the messages with phone number ██████5961. JF was

---

[13] Based on my training and experience, it is common for the trafficker to track the location of a prostitute under their control; this role may also be given to the bottom to assist in managing the prostitute under the trafficker's control.

1  also asked to identify which messages in her phone were between her and Kash; she

2  pointed to the messages with phone number ▓▓▓▓2461. When asked about the

3  messages exchanged with Kash as seen above, JF explained that Kash was in essence

4  trying to get JF's location to bring JF back under PORTER's control.

### COMMERCIAL SEX ADS

6      33.    Using a law enforcement program that aggregates commercial sex ads

7  from sites known for prostitution, a search was conducted for PORTER's phone number

8  (▓▓▓▓5961) and yielded ads depicting JF and advertising her for a two-girl special

9  (commercial sex act with two prostituted persons) in San Diego between April 7th and

10  April 9th. The ad is pictured below but edited to remove explicit photos. As seen below,

11  PORTER's phone number is listed in the ad as well as JF's nickname of "Dyamond."

12  In addition, based on training and experience, TFOs believe this to be a prostitution ad

13  based on the language including the use of the phrase "incalls and outcalls."

// 

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813

34.     Similarly, when searching by PORTER's number, ads were located depicting who TFOs believe to be Kash. Those ads were also posted in San Diego on April 9th, as seen below. The ad has been edited to remove explicit photos. TFOs believe this to be Kash since, based on JF's statement, only the three of them were in San Diego together during this time, and the nickname listed in the ad is "Kashh".

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

**1**
**2**
**3**

35.    Ads for Kash listing her own phone number (███████2461) were also located. The ads were posted between April 7th and April 9th, in San Diego, and list the same name of "Kashh."

**4**
**5**
**6**
**7**
**8**
**9**
**10**
**11**
**12**
**13**
**14**
**15**
**16**
**17**
**18**



**19**
**20**
**21**

36.    Uniquely, in the ads of JF listing PORTER's phone number and the ad of Kash listing Kash's phone number, following their nickname is the same emoji. This emoji is not in the ad of Kash listing PORTER's phone number.

**22**

**HOTEL ROOMS**

**23**
**24**
**25**
**26**
**27**

37.    In messages exchanged between JF and PORTER, PORTER sends JF the address to their hotel room, 15822 Mojave Drive, Victorville, CA 92394. A Google search for this address linked it to the Economy Inn. A Google search for the Economy Inn's rooms yielded the below photo showing the bedding used (below left). In JF's statement, she explained that when she first arrived at the hotel room in Victorville,

**28**

---

1   Kash was there with another female who left shortly after. From a review of the ads

2   posted under Kash's phone number, there is an ad with a photo depicting who TFOs

3   believe to be Kash and the unknown female. The bedding is the same as the photo on

4   the left. The ad was posted on April 5th, the same day that JF and PORTER began

5   messaging one another.

 

13   38.    On April 11th, I went to the Economy Inn in Victorville and located a

14   record that PORTER was registered to room 204 from April 2nd to April 6th; the hotel

15   had a copy of PORTER's driver's license on record with the registry. The front desk

16   manager recognized PORTER and said he was staying at the hotel with PORTER's

17   "girlfriend" who was registered to room 203. Records for room 203 showed it was

18   registered to L█████ E██████ from April 2nd to April 3rd. The hotel had a copy of L.E.'s

19   driver's license on record with registry. TFOs compared the photo of L.E. to photos in

20   the ads of Kash and could not conclusively say they are one in the same person.

21   Therefore, on April 12th, a TFO assigned to the Orange County Human Trafficking Task

22   Force showed JF a photo of L.E. JF believed L.E.'s complexion was too light to be

23   Kash.

24   39.    On April 12th, TFOs went to the Motel 6 Downtown San Diego location

25   and obtained registry information. The front desk manager provided a registration for

26   room 320 in PORTER's name, providing phone number ████████5961. PORTER

27   checked in on April 7th at about 3:00PM and checked out on April 8th, at about 1:00PM.

28   PORTER's stay at the hotel was abruptly ended due to hotel staff discovering he had

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813

1  two unregistered guests (females) at the room with him and the occupants being smoked
2  in. As a result he was asked to leave the premises. The surveillance footage reviewed
3  shows PORTER, JF, and an unknown female enter and exit the room on multiple
4  occasions. There was also observed footage of the vehicle in which PORTER arrived at
5  the hotel in, a white 4-door sedan, consistent with the make and model of PORTER's
6  white BMW. Motel 6 staff did not note the make/model/plate of the vehicle.

7  **SURVEILLANCE FOOTAGE**

8  40.   On April 12th, 7-Eleven corporate sent TFO Buchholtz surveillance
9  footage of their parking lot. The following is a synopsis from a review of that footage.
10  At about 1:03 p.m., a white BMW matching the description of PORTER's vehicle enters
11  the frame and stops in the driveway of the parking lot as though it is entering the
12  roadway on Robinson Avenue. The vehicle's license plate cannot be read from the
13  video. The rear driver's side passenger door opens and clothing/belongings are thrown
14  out of the vehicle as the vehicle continues to move towards the roadway. The vehicle
15  leaves the frame of the video. A short time later, JF can be seen entering the frame from
16  the direction that the vehicle can be seen exiting the frame. She appears to be quickly
17  moving away from the area of the vehicle and pulling up her top. None of the other
18  camera angles captured JF exiting the vehicle. Additionally, due to the dark tint of the
19  windows, the occupants cannot be seen.

20  41.   On April 12, TFO Buchholtz received surveillance footage from Robinson
21  Plaza, a shopping center located along Robinson Avenue and Fourth Avenue. In the
22  footage, a white BMW matching the description of PORTER's vehicle is seen driving
23  into the 7-Eleven lot and coming to a stop. A male exits from the driver's seat, opens
24  the rear driver's side door, and begins making quick movements with his arms
25  consistent with a striking motion. The male then gets back into the driver's seat and the
26  vehicle pulls out onto Robinson Avenue. As the vehicle exits onto Robinson Avenue, a
27  figure consistent with JF's build and description is ejected out of the same rear driver's
28  side door. The ejected passenger appears to land on their back near the vehicle's rear

driver's side tire. The vehicle then continues down Robinson Avenue with the rear driver's side door still open. Multiple pedestrians in the vicinity can then be seen assisting the ejected passenger.

### APRIL 17, 2023 ENCOUNTER

42.     On April 17, 2023, SDHTTF members developed information about the whereabouts of PORTER and Kash. PORTER and Kash were subsequently stopped after they exited a motel parking lot in San Bernardino, CA. Kash was then identified as Aaliyah White (WHITE), date of birth ███████ WHITE's appearance matched that of the individual depicted in the Megapersonals ads advertising commercial sex services under the name "Kashh", utilizing both PORTER's ████5961 phone number and Kash's ███████2461 phone number.

### PRESERVATION OF EVIDENCE

43.     On April 14, 2023, a preservation request was submitted to Meta Platforms, Inc. for the 2130_countup Instagram account. On April 14, 2023, Meta Platforms, Inc. provided notification that the account had been preserved.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

44.     The United States has attempted to obtain this data by other means, specifically the screenshots referenced above. The prior attempts were successful because but do not constitute the full records from the subject account for the time period in question, including but not limited to evidence of the individual who exercised care, custody, and control of the account during the relevant events.

### INSTAGRAM

45.     Instagram is a subsidiary of Meta Platforms, Inc., an Internet company that, among other things, provides electronic communication services and remote computing services to its subscribers.  Instagram's services allow its subscribers to exchange electronic communications with others through the Internet. Instagram subscribers access Instagram services through the Internet.

46.     Subscribers to Instagram use screen names during communications with others.  The screen names may or may not identify the real name of the person using a particular screen name.  Although Instagram requires users to subscribe for a free Instagram account, Instagram does not verify the information provided by the subscriber for its free services.

47.     At the creation of an Instagram account and for each subsequent access to the account, Instagram logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet.  IP addresses are leased to businesses and individuals by Internet Service Providers.  Obtaining the IP addresses that have accessed a particular Instagram account often identifies the Internet Service Provider that owns and has leased that address to its customer.  Subscriber information for that customer then can be obtained using appropriate legal process.

<u>PROCEDURES FOR ELECTRONICALLY STORED INFORMATION</u>

48.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta Platforms, Inc. are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Meta Platforms, Inc. for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta Platforms, Inc.  The impact on Meta Platforms, Inc.'s business would be disruptive and severe.

49.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Instagram account, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta Platforms, Inc., to protect the privacy of Meta Platforms, Inc. subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, Homeland Security Investigations seeks authorization to

Email Search Protocol_SLF_041813

allow Meta Platforms, Inc. to make a digital copy of the entire contents of the account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

50. Analyzing the data to be provided by Meta Platforms, Inc. may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

51. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting

the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

52.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

53.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

<u>CONCLUSION</u>

54.     Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, §§ 1591 and 2422 and will be found at the premises to be searched as provided in Attachment A.

Aron Marcellus
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this 25th day of April 2023.

HONORABLE WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

Email Search Protocol_SLF_041813

## ATTACHMENT A

Meta Platforms, Inc. (owns Facebook and Instagram) is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025.

Meta Platforms, Inc. subsidiary Instagram hosts the following electronic communication or remote computing services account that is the subject of this search warrant and application: 2130_countup.

ATTACHMENT B

I.      Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the electronic files, copy them, and deliver the same to the officer.

II.     Items to be provided by Meta Platforms, Inc.

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Meta Platforms, Inc., regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta Platforms, Inc., or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on April 14, 2023, Meta Platforms, Inc. is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.      Business records and subscriber information, in any form kept, pertaining to the account, including:

1.      Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.      Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.      Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.      Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information

about networks and connections, cookies, operating systems, and apps and web browsers;

5.   Advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.   Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers from April 5, 2023 through April 10, 2023;

7.   Privacy and account settings, including change history; and

8.   Communications between Meta Platforms, Inc. and any person regarding the account, including contacts with support services and records of actions taken;

B.   Content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from April 5, 2023 through April 10, 2023;

C.   Content, records, and other information relating to communications sent from or received by the account from April 5, 2023 through April 10, 2023, including but not limited to:

1.   The content of communications sent from or received by the account, including direct and group messages, and associated multimedia and metadata, including deleted and draft content if available;

2.   Records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.   Records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.  Associated logs and metadata;

D.  Content, records, and other information relating to all other interactions between the account and other Instagram users from  April 5, 2023 through April 10, 2023, including but not limited to:

    1.  Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

    2.  Users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

    3.  Contacts and related sync information; and

    4.  Associated logs and metadata;

E.  Instagram Messenger – messages and voice audio clips/files associated with the above-listed account accessed through Instagram Messenger, including the text content of the messages or the audio content, from April 5, 2023 through April 10, 2023;

F.  Instagram Messenger – video calls, video clips, or movies including IP addresses, IMEI or MAC addresses, and date/times of connections associated with the above-listed account accessed through Instagram Messenger from April 5, 2023 through April 10, 2023;

G.  Content the user deleted from Instagram or Instagram Messenger from April 5, 2023 through April 10, 2023;

H.  Records of searches performed by the account from April 5, 2023 through April 10, 2023; and

I.  Location information, including location history, login activity, information geotags, and related metadata from April 5, 2023 through April 10, 2023.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**III**.   The search of the data supplied by the ISP pursuant to this warrant will be conducted by as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of April 5, 2023 through April 10, 2023 and to the seizure of:

a.   Communications, records, and attachments tending to discuss or establish sex trafficking by force, fraud or coercion or coercion and enticement of a minor to engage in prostitution;

b.   Logs, photos, postings, "likes," activity, and records tending to discuss or establish sex trafficking by force, fraud or coercion or coercion and enticement of a minor to engage in prostitution;

c.   Communications, records, and attachments tending to identify Deondre Demetris Porter and any co-conspirators involved in the activities in III(a) and III(b) above; and

d.   Communications, records, and attachments that provide context to any communications described above, such as direct messages sent or received in temporal proximity to any relevant Instagram account and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of 18 U.S.C. §§ 1591 and 2422.**